IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
March 8, 2005 Session

## STATE OF TENNESSEE v. EARNEST GWEN HUMPHREY

**Direct Appeal from the Criminal Court for White County**
No. CR815     Lillie Ann Sells, Judge

_____

### No. M2003-01489-CCA-R3-CD - Filed August 24, 2005

_____

The appellant, Earnest Gwen Humphrey, was convicted by a jury in the White County Criminal Court of second degree murder. The trial court imposed a sentence of twenty-two years incarceration in the Tennessee Department of Correction. On appeal, the appellant raises multiple issues for our review, including challenges to the voir dire of the jury, the sufficiency of the evidence, prosecutorial misconduct, and the jury instructions. Upon our review of the record and the parties' briefs, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court is Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, J., joined. JOSEPH M. TIPTON, J., filed a concurring opinion.

Michael D. Galligan and John P. Partin, McMinnville, Tennessee, for the appellant, Earnest Gwen Humphrey.

Paul G. Summers, Attorney General and Reporter; Elizabeth B. Marney, Senior Counsel; William E. Gibson, District Attorney General; and Benjamin W. Fann and William M. Locke, Assistant District Attorneys General, for the appellee, State of Tennessee.

### OPINION

### I.  Factual Background

In May 2001, the White County Grand Jury indicted the appellant for the first degree murder of the victim, Joey Jones. The State's proof at trial revealed that Leta Humphrey, the appellant's wife, was involved in a year-long affair with the victim. The victim's wife, Wilma Ann Jones, learned of the affair, and, on February 24, 2001, she confronted Leta and the victim when she found

them in a parked car.[1] At trial, Wilma testified that she was angry and insisted that the appellant be informed of the affair. She attempted to reach the appellant by telephone but was unsuccessful. Thereafter, Wilma, Leta, and the victim went to the Humphreys' residence, and Wilma told the appellant that the victim and Leta were having an affair. Afterward, the victim and Wilma left the residence. Sometime later, the victim told Wilma that the affair was over, and they decided not to get a divorce. On Thursday before the victim was killed, Wilma spoke with the victim. The victim told her that Leta had informed him that the appellant had threatened to kill him. At trial, Wilma stated that she did not think the victim was violent. She said that the victim was about five feet and six inches tall and weighed approximately 130 pounds.

Leta testified at trial that she and the victim worked at the Mallory Timers plant in Cookeville. They began an affair about a year before the victim was killed. The appellant learned of the affair on February 24, 2001, after Wilma found Leta and the victim together in a parked car. Following a "big scene" in the parking lot, Wilma, Leta, and the victim went to the Humphreys' residence. The appellant was told of the affair. Later, after Wilma and the victim left, Leta and the appellant talked about the affair and their marriage. The appellant was upset and asked Leta not to leave. The couple talked with two of their adult children, Wade Humphrey and Terri Lowhorn, and Leta agreed to remain at home.

Leta testified that after the appellant learned of the affair, he became very controlling and limited the time she could spend away from home. He monitored her activities, limited her visits with their daughter, Terri Lowhorn, and would not allow Leta to answer the telephone. The appellant also began following Leta to work. Lowhorn testified at trial that prior to February 24, 2001, her mother visited her frequently at Lowhorn's hair salon. However, after the appellant learned of the affair, Leta was allowed to visit only twice each week. Lowhorn stated that the appellant began to follow her mother, and he threatened to kill the victim if Leta ever talked to him.

At the appellant's insistence, Leta signed a deed conveying their real estate to two of their three children. The deed provided that Leta and the appellant would retain a life estate in the property. The appellant told Leta that because of the affair, he felt like something he owned had been taken from him. He warned Leta that if she left him, "Joey was dead." After learning that the victim had given Leta some jewelry, the appellant insisted that Leta return the jewelry. When Leta expressed her reluctance to return the jewelry, the appellant took her to the basement of their house and showed her a bullet. At trial, Leta recalled that the appellant said, " I'll show you what I've got for [the victim], you know, if you don't give [the jewelry] back."

Leta stated that the appellant was a hunter and owned a large number of guns. On one occasion after the February 24, 2001, incident, the appellant told her that he had seen her walk over to the victim's car as she was leaving work. The appellant informed her that if she had opened the victim's car door, he would have shot the victim.

---

[1] Some of the witnesses in this case share a surname. Therefore, for clarity, we have chosen to utilize their first names. We mean no disrespect to these individuals.

On the afternoon of April 18, 2001, after leaving work, Leta visited the victim at his new house. She stayed a few minutes and then went home. When she arrived home, the appellant asked her why she was late. Leta told the appellant that she stopped for a Coke on the way home. She denied that she had been with the victim. The appellant made her swear on a Bible that she was telling him the truth. The appellant told Leta that he no longer trusted her and asked if she wanted to go to the victim. When Leta responded affirmatively, the appellant told Leta to pack her bags and have the victim come to the house and pick her up. Leta recalled that the appellant said, "[H]e can come in and get you, you're not going to run out to the car like a kid, he can come in and get you." The appellant took Leta's keys from her car and told her that she could have the car after she filed for divorce. The appellant told Leta to tell the victim that he would not be in the house when the victim arrived.

Leta agreed to the appellant's demands. She telephoned the victim and asked him to come to the house and get her. While packing her bags, Leta realized that she needed to ask the appellant a question. She went downstairs to the basement and saw the appellant with a rifle in his hands. The appellant then left the house in his truck.

Shortly thereafter, at approximately 7:00 p.m., the victim arrived at the Humphreys' residence. He followed the driveway to the rear of the house where the basement door was located. Leta was waiting for him. As the victim got out of his vehicle, he was holding a pistol. When he walked into the basement, he put the gun in the rear waistband of his pants.

Leta stated that the victim came into the basement and picked up her bag of clothes and her tennis shoes. They left the basement together and walked toward the victim's vehicle. Suddenly, Leta heard the victim grunt and realized that he had been shot. She recalled that the victim was dead when he hit the ground. The victim's feet were pointed toward the basement door and his head was lying toward his vehicle. His gun was still in the back of his pants. While Leta was attempting to talk to the victim, the appellant approached from the garage, saying, "[I]t hurts, don't it." The appellant was holding a rifle in his hands. The appellant ordered Leta to go inside and sit on the upstairs couch. He told her not to leave and that he would call police. Before going upstairs, Leta watched the appellant take a hammer and break the windows in the basement door. Leta testified that she went upstairs and remained there until police arrived.

After the shooting, the appellant called L.V. Bane and asked him to get the appellant's son Wade from church and have him come to the appellant's house. Once the call to Bane was complete, the appellant went upstairs and told Leta not to be frightened, explaining that he was going to fire another gun in the basement. Thereafter, Leta heard a gunshot. She looked out of her bedroom window and saw the appellant standing outside, wiping off the victim's pistol.

After wiping the pistol, the appellant came upstairs. Leta recalled that the appellant said, "[T]his is all your fault. And if you don't want to see me go . . . to prison . . . it happened like this and this." Shortly thereafter, Wade arrived at the residence, and the appellant asked Wade to contact the authorities.

Police and emergency medical service (EMS) workers arrived at 7:37 p.m. Police noticed that the victim's body was positioned face down with his head lying in the direction of his vehicle and his feet pointed toward the basement door. A pistol was laying on the ground five to seven feet from the basement door. The victim's sunglasses were located three to five feet away from his head. EMS workers turned the body over and attempted to resuscitate the victim. Eventually, they ceased their efforts and transported the victim's body to White County Hospital. Police failed to bag the victim's hands to preserve evidence prior to transporting the body. After the body was removed, police interviewed the appellant and Leta.

Police observed that the glass in the basement door window was shattered, and there was glass on both the inside and outside of the door. They searched the appellant's basement but found no signs that a bullet had been fired into the basement. Although the basement door had a black scuff mark which could have been made from a shoe, the sturdy door showed no other signs of damage. Additionally, police noticed that the victim had been wearing shoes with black soles. They did not observe any bullet holes on the outside of the appellant's house; however, on a couch in the appellant's basement, police found a shotgun and a .35 caliber rifle. Both guns had a scope for hunting. A spent .35 caliber cartridge was found inside the basement. The victim's gun, a Ruger .357, was recovered. The pistol contained five shells in the chamber, consisting of one spent round and four live rounds.

Police then searched the appellant's garage. Police noticed that there was a slight grade from the garage toward the house. During the search of the garage, they found five hammers, three of which were covered in cobwebs and appeared to have not been moved in quite some time. One of the two remaining hammers had shattered glass embedded in the handle. The glass in the hammer matched the reflective properties of the glass from the basement door.

Leta gave police a statement on the night of the offense, and she made another statement a few days later. Her statements to police were substantially the same as her trial testimony. However, in her statements to police, she failed to mention that the appellant had wiped the victim's pistol.

Upon completing her statement to police, Leta went to the home of the Humphreys' oldest daughter, Tonya Hyder. At trial, Hyder recalled that Leta recounted to her the events of that night, including the fact that after the shooting, the appellant wiped the victim's gun.

After the victim was pronounced dead at the hospital, his hands were tested for gunshot residue. However, the gunshot residue test was conducted after the victim's hands had been washed by hospital personnel. The results were inconclusive. No fingerprints were found on the victim's gun.

Carolyn Jones, the victim's sister-in-law, testified that she worked at Mallory Timers with Leta and the victim. She learned of Leta's affair with the victim on February 24, 2001. She recalled that Leta took a vacation from work the week after February 24. After Leta returned to work, Carolyn saw the appellant at Mallory Timers almost every day, parked in different locations. She

stated that she had never seen the appellant at the plant prior to February 24. Carolyn said that she did not believe the victim was a violent person.

Mike Jones, the victim's brother, testified that he also worked at Mallory Timers. He stated that he learned of the victim's affair in late February 2001. Prior to that date, he had never seen the appellant at the plant. However, around the first of March 2001, the appellant came to the plant frequently, parking in different places.

Mike recalled that at approximately 6:00 p.m. on April 18, 2001, he saw the victim at their sister's house. The victim told Mike that he was going to pick up Leta. The victim asked to borrow Mike's .357 Magnum. Prior to that date, the victim had asked to borrow the gun "because he was going to take it to Michigan with him that night." Mike asserted that the gun was a legal deer hunting weapon and that he had previously used the gun for that purpose. Mike told the victim that he could borrow the gun and informed him that the gun was on the top shelf of Mike's bedroom closet. Mike testified that the victim was not a violent person.

Dr. Charles W. Harlan performed an autopsy on the victim. At trial, the appellant and the State stipulated that

> if Dr. Harlan were called to testify, he would say that [the victim] died from a gunshot wound that entered the right side of the chest forty-five (45) inches above the heel traversing heart, liver, stomach, spleen, T-12 rib, aorta traversing anterior to posterior, right to left, superior to inferior. That [the victim] most likely would have lived as much as five (5) minutes and have been conscious up to eighty-percent (80%) of that time. That the bullet was on a slightly downward path, and the path was not altered before exiting the body forty-four inches above the heel.

The autopsy report revealed that the victim was shot in the chest and the abdomen and that the gunshot wound caused his death. The victim was sixty-five inches tall and weighed 108 pounds.

The appellant's proof at trial revealed that the appellant learned of his wife's affair with the victim on February 24, 2001. The appellant was "tore all to pieces," but he wanted to work to save his marriage. He admitted that after learning of the affair, he began following Leta because "I wanted to trust her." He also acknowledged that on several occasions he went to the plant where Leta worked and watched her. The appellant denied that he limited his wife's activities, but he conceded that he asked her not to go unaccompanied to Cookeville where her trysts with the victim had taken place. The appellant admitted that he had made threatening remarks toward the victim, but he claimed that he did not mean the threats.

The appellant testified that on the day of the shooting, Leta arrived home an hour and a half late from work. The appellant asked if she had car trouble. Leta said that she was late because she

had stopped at a filling station to get a cold drink. She denied that she had been with the victim. The appellant got a Bible and asked Leta if she would swear on the Bible. Leta took the Bible and again denied that she had been with the victim.

Shortly thereafter, the appellant decided to go fishing. He left the house, but he had to return because he had forgotten his tackle box. Before leaving the second time, the appellant went into the kitchen for a glass of tea. He noticed that the telephone cord was moving as if the telephone had recently been used. Leta claimed that she had been talking to a friend. The appellant left the house, but he did not quite believe Leta's claim.

After the appellant left, he parked his truck a short distance from his house. The appellant said that he walked home through the woods so he "could go back and see what she was up to. I was suspicious. I knowed she wasn't acting right and I just wanted to see what she was going to do." As he passed through the garage, the appellant took the keys from Leta's car to ensure that she had to talk with him before she left. Then, he went to the basement and sat on a bed behind a partition.

Soon, the appellant heard his dog barking, followed by the sounds of an approaching vehicle. The appellant looked out of the window and saw the victim getting out of his vehicle. The appellant locked the basement door and told the victim to leave him and Leta alone. The victim kicked the basement door at least once. The victim was approximately three feet away from the basement door. The appellant went to his gun room, which was located in the basement. He retrieved a gun and loaded it with at least one bullet. The appellant testified, "There's a partition wall and about the time I got there, I heard a gun go off and heard it hit behind me, heard something behind me. And I just, I didn't even aim, I just pointed the gun at the door and shot."

After the gunshots, Leta came downstairs, screaming. She went outside and walked straight to the victim. The appellant laid his gun on the couch and told Leta to go sit on the couch inside the house. She said to the appellant, "[W]hen I get through talking to the law, they're going to take you away from here in handcuffs." The appellant testified that he was "real upset" after the shooting. He left the house, got into his truck, and drove it home. The appellant knew he should call someone, but he was too upset to talk to anyone, especially a stranger. He attempted to contact Harold Bennett, but Bennett was not at home. The appellant then called L.V. Bane and asked Bane to get Wade from church.

When Wade arrived at the appellant's house, the appellant told him that he had shot the victim and asked Wade to call police and an ambulance. Wade returned to his own home, which was located nearby, and had his wife call 911. Shortly, a 911 operator called the appellant. The appellant informed the operator that he had shot the victim. The appellant admitted that he probably told the 911 operator that he did not know where he hit the victim and that he did not care. The appellant testified that he felt bad about killing the victim.

At trial, the appellant denied breaking the basement door window. He stated that he had used his hammers to break windows out of Wade's home when he was remodeling his house. An expert

witness testified that glass from several kinds of residential windows had the same reflective properties.

Wade Humphrey, the appellant's son, testified that he came to the appellant's house after Bane got him out of church. The appellant told Wade that he had shot the victim. Wade left the appellant's house, went to his home, and had his wife call 911 to report the shooting. Wade returned to the appellant's house and went inside to talk with Leta. Leta told Wade, "I ain't going to let [the victim] die for nothing. . . . [W]hen I get through talking with the police . . . they'll be taking your daddy away in handcuffs." Wade recalled that he and the appellant had used the appellant's hammers to shatter the windows of Wade's home when he was remodeling at the end of 1998.

Danny Humphrey, the appellant's brother, testified that he lived approximately one quarter of a mile from the appellant's home. After 6:30 pm. on the day of the shooting, Danny noticed the appellant's truck parked in front of their mother's home, which was a short distance from the appellant's home. Danny stated that there were two ways to go to the appellant's house; the truck was visible from either direction.

John Green, Wade's father-in-law, testified that early in the morning of April 19, 2001, he and Wade went to the appellant's house to clean the basement. The night before, Detective Chris Isom told Wade that the crime scene had been released. While Green and Wade were cleaning, Green found a bullet fragment underneath a chair in the basement. Wade and Green noticed two chips in the walls of the basement. They believed that the chips had been caused by a bullet hitting the wall and ricocheting.

Joe Lee Humphrey, the appellant's first cousin and Wilma Jones' third cousin, testified that he lived a short distance from the appellant. On the day of the shooting, he heard a shotgun being fired in the direction opposite from the appellant's home, toward the lake. Fifteen to twenty minutes later, he heard two shots, three to five seconds apart, coming from the appellant's home. The shots sounded as if they came from high powered guns.

The appellant had numerous character witnesses testify as to his truthfulness.

Based upon the foregoing proof, the jury found the appellant not guilty of the indicted offense of first degree murder but found him guilty of the lesser-included offense of second degree murder. The parties agreed upon a sentence of twenty-two years incarceration. On appeal, the appellant raises several issues for our review. Specifically, the appellant challenges:

> [(1)] Whether the trial court erred in its instructions to the jury with regard to the "knowing" component of second degree murder[;]
>
> [(2)] Whether the trial court erred in overruling defense counsel's objection to improper argument by counsel for the State during its rebuttal as to bullet trajectory that was not introduced as evidence[;]

[(3)] Whether the evidence introduced at trial was sufficient to support a verdict of guilty of murder in the second degree or any other crime beyond a reasonable doubt, in light of the proof introduced of self-defense[;]

[(4)] Whether the trial court erred in its instructions to the jury with regard to its instruction not to consider voluntary manslaughter until first deciding to acquit as to second degree murder[; and]

[(5)] Whether the trial court erred in its decision to voir dire the jury panel as a whole, rather than in panels of six.

We will address these issues in an order different than that in which they were raised.

## II. Analysis

### A. Voir Dire

Before beginning jury selection, the appellant requested that he be permitted to conduct individual voir dire of the jurors. The trial court advised the State and the appellant that it would ask some general preliminary questions of the jurors. Afterward, the remaining jurors would be brought into the courtroom in panels of six, and the attorneys would be allowed more extensive voir dire.

After the voir dire of the first panel of six, the trial court determined that the jury selection was taking too much time and stated:

> All right, ladies and gentlemen, I'm not going to be having voir dire of six people at a time at the rate we're going. . . . There's no questions that I've heard that would cause individual voir dire or in panels of six other than perhaps the media or gossip through some of these plants and that sort of thing. But we're not going to go at this pace for the rest of this trial.

The trial court then stated that the entire jury panel would undergo voir dire as a group. The court explained:

> When we come back in here, I'm going to bring every juror in this room and I'm going to assign them a number and we're going to [go] through the seating chart. And the attorneys will voir dire those people as a group.
>
> I will identify those people that have been exposed to pre-trial media attention, we'll identify those on the front end, list their names, and then we'll individually voir dire those people so that they won't,

-8-

or if they've heard gossip through some place, facts about the case, we'll identify those people and then we'll voir dire those people either in groups or six or maybe even individually.

. . . .

There's no questions that I've heard that would cause individual voir dire or in panels of six other than perhaps the media or gossip through some of these plants and that sort of thing. But we're not going to go at this pace for the rest of this trial.

The appellant asked if the court intended to voir dire the jury in panels of twelve. The court responded:

Ever how many people are left in this courtroom. We're going to assign them a number when we come back, just like we do every other trial in this jurisdiction. And then you'll have the opportunity to voir dire them and we'll charge them with beyond a reasonable doubt and we will give them, they'll be seated up here and they'll be seated ever how many it takes across the back and we'll voir dire the whole group at the same time.

The appellant complained, "I just think that's unmanageable to have forty or fifty in here trying to question. And I don't think that will speed anything up at all." The trial court disagreed and proceeded with a mass voir dire. Challenges were issued, and the jury was sworn. On appeal, the appellant maintains that the trial court's "subsequent decision to voir dire the entire panel at once prejudiced his ability to ensure a fair and impartial jury by hampering his ability to gather information to use in making challenges of jurors, both peremptory and for cause."

"The ultimate goal of voir dire is to insure that jurors are competent, unbiased, and impartial, and the decision of how to conduct voir dire of prospective jurors rests within the sound discretion of the trial court." State v. Cazes, 875 S.W.2d 253, 262 (Tenn. 1994). In the instant case, the trial court determined that the jury should undergo voir dire as a whole instead of in panels of six or in panels of twelve. Our supreme court has observed that "[t]he prevailing practice is to examine jurors collectively." State v. Austin, 87 S.W.3d 447, 471 (Tenn. 2002). "'Individual voir dire is mandated only when there is a "significant possibility" that a juror has been exposed to potentially prejudicial material.'" Id. at 471-72 (quoting State v. Howell, 868 S.W.2d 238, 247 (Tenn. 1993)). In the instant case, the court allowed individual voir dire of those jurors who indicated that they had some degree of knowledge about the facts of the case or the parties involved. Otherwise, the voir dire was conducted collectively. The appellant makes no specific allegation of how he was prejudiced by the trial court's method of voir dire. Moreover, our review of the record reveals no clear prejudice suffered by the appellant. See State v. Keen, 926 S.W.2d 727, 739 (Tenn. 1994). Therefore, the appellant is not entitled to relief on this issue.

## B. Sufficiency of the Evidence

The appellant argues that, in light of his claim of self-defense, there was insufficient evidence to support his conviction for second degree murder. On appeal, a jury conviction removes the presumption of the appellant's innocence and replaces it with one of guilt, so that the appellant carries the burden of demonstrating to this court why the evidence will not support the jury's findings. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The appellant must establish that no reasonable trier of fact could have found the essential elements of the offense beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); Tenn. R. App. P. 13(e).

Accordingly, on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn therefrom. See State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). In other words, questions concerning the credibility of witnesses and the weight and value to be given the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact, and not the appellate courts. See State v. Pruett, 788 S.W.2d 559, 561 (Tenn. 1990).

To sustain the appellant's conviction for second degree murder, the State was required to prove that the appellant knowingly killed the victim. See Tenn. Code Ann. § 39-13-210(a)(1) (2003). Our supreme court has determined that second degree murder is a result of conduct offense. See State v. Ducker, 27 S.W.3d 889, 896 (Tenn. 2000). Accordingly, "[a] person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result." Tenn. Code Ann. § 39-11-302(b) (2003). Furthermore, "[a] homicide, once proven, is presumed to be second degree murder." State v. Millsaps, 30 S.W.3d 364, 368 (Tenn. Crim. App. 2000).

In the light most favorable to the State, the proof at trial reveals that after learning that Leta and the victim were having an affair, the appellant arranged for the victim to come to his house. Before the victim's arrival, Leta saw the appellant, a hunter, holding a rifle in the basement. The appellant left the house shortly thereafter, having told Leta that he would not be there when the victim came to the residence. The victim arrived, entered the basement, and picked up Leta's bag and shoes. The victim and Leta left the basement. While walking toward the victim's vehicle, the victim was shot by the appellant. After shooting the victim, the appellant approached Leta and the victim from the garage, which was on a slight incline away from the basement, and said, "[I]t hurts, don't it." The appellant then smashed the window of the basement door, fired the victim's pistol, and wiped the pistol to disguise the murder. Based upon the foregoing facts, we conclude that the jury had ample evidence to convict the appellant of second degree murder.

The appellant essentially contends that the jury erred in not finding that he acted in self-defense. Self-defense is essentially a fact question for the jury. See State v. Clifton, 880 S.W.2d 737, 743 (Tenn. Crim. App. 1994); State v. Ivy, 868 S.W.2d 724, 727 (Tenn. Crim. App. 1993). The jury, as was its prerogative, chose not to credit the appellant's theory of self-defense. We will not second-guess the factual determination of the jury.

## C. Closing Argument

Next, we will address the appellant's contention that the trial court erred in overruling his objection to the State's rebuttal closing argument. Specifically, the appellant contends that the State was improperly allowed to argue regarding the trajectory of the bullet that struck the victim. The appellant contends that the State's argument was based on evidence that was not introduced at trial.

During the State's initial closing argument, the State argued that the evidence established the victim was "shot in the chest, right through the heart, entering at forty five inches and exiting at forty four inches, downward and to the left, consistent with a shot coming from the garage, which had land that is slightly elevated." The appellant asserted in his closing argument that the physical proof demonstrated, in conformity with the appellant's version of events, that the appellant fired the fatal shot from inside the basement. As support for this position, the appellant pointed out that police found an ejected rifle shell in the basement. The appellant stated that the bullet entered the body at forty-five inches and exited at forty-four inches and argued that the angle could be attributed to the way the appellant, as a hunter, was taught to hold his rifle.[2] Additionally, the appellant contended that the physical proof revealed that the victim fired a gun into the basement from outside the basement door. The appellant maintained that the jury could infer that a gray spot near the basement door, which spot was visible in pictures of the appellant's basement, was gunpowder residue. The State objected to this argument. The trial court overruled the objection, ruling that the jury could permissibly make such an inference.

In response, during rebuttal closing argument, the State asserted:

> You note also that the bullet entered forty five inches in the chest above the heel and it went out at forty four inches above the heel, which meant that in a period of about one foot, more or less, the thickness of the body, the bullet went down one inch. And the autopsy, the stipulations, the autopsy report shows that this bullet did not deflect, it stayed on a straight path.
>
> Now if that bullet went down one inch in the thickness of his body from front to back, that's about one inch per foot. If this shot had been made from inside the house about fifteen or twenty feet away, that bullet would have been going down fifteen to twenty inches, because it was on a direct path as it went through the body and not deflected.

---

[2] The record suggests that defense counsel, in making his closing argument, demonstrated how the appellant as a hunter held the gun. However, the record contains no description of counsel's demonstration.

The appellant objected to this argument, contending that there had been no proof at trial to support the State's theory. The trial court warned the State not to argue proof that had not been introduced into the record. The court then allowed the State to proceed.

Continuing rebuttal, the State maintained that "the jury can infer that if the bullet did not change direction, it went in a straight line, that it dropped one inch going approximately a foot through the body, that it would have dropped fifteen to twenty inches before it got there." The appellant again objected to this argument. The trial court sustained the objection and instructed the jury to disregard any statements regarding proof that was not "put into the record." The court noted that the State could argue regarding "what the proof may infer."

The State, continuing its argument, asserted:

> The testimony from Leta is that he came walking down from the garage area and the testimony presented to you is that at the back of the garage this land goes up slightly. And I believe that you can infer that if he shot from a higher place behind the garage and the bullet was going down as it did in the body, that this could have been the path of the bullet instead of in the house.
>
> This shot was made with a telescope site on that rifle and it was daylight and it hit the heart, the stomach and the aorta.
>
> Now these comments have been made basically concerning the statements that he had made that this shot was fired from the inside of the house. It's the opinion of the evidence has shown that this could not have been shot from inside the house due to the path of the bullet.

Again, the appellant objected. The trial court stated, "I understand the objection. The objection is overruled. The counsel can argue any inferences that the proof has shown and [the State] may proceed." On appeal, the appellant complains that the trial court should not have overruled the appellant's objection to the State's rebuttal closing argument.

It is well-established that closing argument is an important tool for both parties during a trial; thus, counsel is generally given wide latitude during closing argument, and the trial court is granted wide discretion in controlling closing arguments. See State v. Carruthers, 35 S.W.3d 516, 577-78 (Tenn. 2000) (appendix). "Notwithstanding such, arguments must be temperate, based upon the evidence introduced at trial, relevant to the issues being tried, and not otherwise improper under the facts or law." State v. Goltz, 111 S.W.3d 1, 5 (Tenn. Crim. App. 2003).

"In determining whether statements made in closing argument constitute reversible error, it is necessary to determine whether the statements were improper and, if so, whether the impropriety

affected the verdict." State v. Pulliam, 950 S.W.2d 360, 367 (Tenn. Crim. App. 1996). In connection with this issue, we must examine the following factors:

> "(1) the conduct complained of viewed in context and in light of the facts and circumstances of the case[;]
>
> (2) the curative measures undertaken by the court and the prosecution[;]
>
> (3) the intent of the prosecutor in making the statement[;]
>
> (4) the cumulative effect of the improper conduct and any other errors in the record[; and]
>
> (5) the relative strength or weakness of the case."

Id. (quoting Judge v. State, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976)).

Based upon our review of the closing arguments, we conclude that the majority of the State's rebuttal closing argument was in response to inferences made by the appellant during closing. See State v. Timothy Wayne Holland, No. M2001-03129-CCA-R3-CD, 2002 WL 31007428, at *6 (Tenn. Crim. App. at Nashville, Sept. 4, 2002). The appellant argued that the bullet exited the body at a slightly downward angle due to the position of the rifle when the appellant fired the gun. Conversely, the State argued that the angle was best explained by the slight elevation of the garage above the basement area. We conclude that these inferences were permissible based upon the proof adduced at trial. However, we conclude that the State erred in arguing that because the bullet dropped one inch in the body, the bullet would have dropped fifteen to twenty inches from where the appellant purportedly shot in the basement. There was no proof in the record to support this contention. As we have noted, following the appellant's objection to this argument, the trial court instructed the jury to disregard facts not in evidence, thereby curing the error. Generally, we presume that a jury has followed the instructions of the trial court. See State v. Butler, 880 S.W.2d 395, 399 (Tenn. Crim. App. 1994).

### D. Jury Instructions

#### 1. Definition of "Knowing"

Next, the appellant contends that the trial court "erred in its instructions to the jury with regard to the 'knowing' component of second degree murder." In support of his argument, the appellant cites this court's opinion in State v. Page, 81 S.W.3d 781, 785 (Tenn. Crim. App. 2002). In its instructions to the jury, the trial court, without objection, defined the knowing mental state in accordance with Tennessee Code Annotated section 39-11-302(b) (2003):

[A] person acts knowingly if the person acts with awareness either to either that his or her conduct is of a particular nature or that a particular circumstance exists or that the conduct was reasonably certain to cause the result.

In State v. Ducker, 27 S.W.3d 889, 896 (Tenn. 2000), our supreme court explained that second degree murder is strictly a result-of-conduct offense. "A result-of-conduct offense requires that the culpable mental state accompany the result as opposed to the nature of the conduct." Id. Therefore, the second degree murder

statute focuses purely on the result and punishes an actor who knowingly causes another's death. The intent to engage in conduct is not an explicit element of the state's case in second degree murder. Accordingly, a result-of-conduct crime does not require as an element that an actor engage in a specified course of conduct to accomplish the specified result.

Id.

After the appellant's trial concluded, but prior to his motion for new trial, this court released Page, 81 S.W.3d at 785. In Page, the defendant admitted that he struck the victim with a baseball bat; however, the defendant contended that he did not intend to cause the victim's death. On appeal, this court reversed Page's conviction for second degree murder because the trial court erroneously instructed the jury as to both the nature of conduct and result of conduct definitions of "knowingly." Id. at 787-88. This court explained that "[a] jury instruction that allows a jury to convict on second degree murder based only upon awareness of the nature of the conduct or circumstances surrounding the conduct improperly lessens the state's burden of proof. For second degree murder, a defendant must be aware that his or her conduct is reasonably certain to cause death." Id. at 788.

In Page, this court explained that "an erroneous jury instruction, which misstates the applicable conduct element of an offense and lessens the state's burden of proof, is . . . subject to constitutional harmless error analysis." 81 S.W.3d at 789; see also Tenn. R. App. P. 36(b) ("A final judgment from which relief is available and otherwise appropriate shall not be set aside unless, considering the whole record, error involving a substantial right more probably than not affected the judgment or would result in prejudice to the judicial process."). Page recognized that in many homicide trials, erroneous jury instructions misstating the applicable conduct element would be harmless error. See Page, 81 S.W.3d at 789. For example, in cases where the defense is that the defendant is not the perpetrator of the crime or in which causation is not disputed, the instruction would be harmless error. Id. However, when the mens rea of the accused is disputed, the harmlessness of the error is not as clear.

Recently, our supreme court addressed the holding in Page. See State v. Faulkner, 154 S.W.3d 48 (Tenn. 2005). In Faulkner, our supreme court noted:

We agree that a proper instruction defining "knowingly" . . . does not include the nature-of-conduct and circumstances-surrounding-conduct language because second degree murder . . . [is a] result-of-conduct offense[]. We are not convinced, however, that the inclusion of such language is an error of constitutional dimension when the instruction also includes the correct result of conduct definition.

Id. at 58-59. Further, the court stated:

We have found no authority supporting the conclusion in Page that the erroneous instruction lessened the State's burden of proof. Moreover, the conclusion is inconsistent with Page's application of harmless error analysis. The superfluous language in the "knowingly" definition did not lessen the burden of proof because it did not relieve the State of proving beyond a reasonable doubt that the defendant acted knowingly.

Id. at 59 (citation omitted). The Faulker court explained that misstatement of an element of an offense in jury instructions is subject to constitutional harmless error analysis. Id. Expounding on the harmless error analysis, the court noted that

[i]n Page, . . . an element was misstated only to the extent that the erroneous instruction defined the entire scope of the mental state element when only the result-of-conduct definition applied. In our view, the inclusion of such surplusage falls short of being a "misstatement of an element," as that term is used in a constitutional analysis.

Id. at 60. Finally, the court cautioned that "[n]ot every erroneous jury instruction . . . rises to the level of constitutional error." Id.

In the instant case, the appellant never denied shooting the victim. Instead, the appellant claimed that the killing occurred in self-defense. The appellant contended the victim shot at him first, and he simply returned fire. However, substantial proof supports the jury's finding of the appellant's guilt of second degree murder. Notably, the autopsy report reflects that the victim was shot by a single bullet which entered the body near the heart, traveling in a straight line on a slight angle. Proof demonstrated that the garage was at a slight incline away from the basement. Leta, a witness to the shooting, asserted that the appellant shot the victim, who was standing in front of the basement, from the garage. The appellant then approached the fallen victim, taunting, "[I]t hurts, don't it." The appellant had previously threatened to kill the victim. Moreover, we note that the jury was properly instructed on self-defense, which the jury rejected. See State v. Marcillo Anderson, No. W2003-00013-CCA-R3-CD, 2004 WL 115429, at *6 (Tenn. Crim. App. at Jackson, Jan. 13, 2004), perm. to appeal denied, (Tenn. 2004). Further, the State argued that the appellant was guilty of first degree murder, contending that the appellant intended to cause the victim's death. In other

words, the State focused on the result of the appellant's conduct. See State v. Tony Martin, No. W2001-02221-CCA-R3-CD, 2003 WL 261937, at **8-9 (Tenn. Crim. App. at Jackson, Feb. 7, 2003). Accordingly, we conclude that the appellant is not entitled to relief on this issue.

## 2. Sequential Instructions

Finally, the appellant contends that the trial court "erred in its instructions to the jury with regard to its instruction not to consider voluntary manslaughter until first deciding to acquit as to second degree murder." The appellant argues that the "instruction is logically inconsistent, as a defendant could be guilty of second degree murder, but inflamed to the point of reducing the crime to voluntary manslaughter." However, the appellant acknowledges that the issue has been previously and unsuccessfully litigated by other parties.

In the instant case, the trial court instructed the jury as to all of the appropriate lesser-included offenses of first degree murder. The court then instructed the jury that they were to first consider the appellant's guilt of the indicted offense of first degree murder. If the jury found him guilty, they were to so indicate on the verdict forms and cease deliberation. However, if the jury found the appellant not guilty of first degree murder, the court instructed them to proceed to determine the appellant's guilt of the lesser-included offense of second degree murder. If the jury found him guilty of second degree murder, they were to indicate the conviction on the verdict forms and cease deliberation. However, if the jury found the appellant not guilty of second degree murder, the jury was to determine the appellant's guilt of the lesser-included offense of voluntary manslaughter. The appellant argues that such sequential instructions were error.

This court previously examined this issue and determined, "The jury does have a duty to determine the grade of the offense, but the 'sequential' instruction given to the jury was not violative of this duty under Tennessee law. . . . The sequential jury instruction did not preclude the jury from considering the lesser charges. This is evident from the jury's finding of guilt of second degree murder rather than first degree murder." State v. Raines, 882 S.W.2d 376, 382 (Tenn. Crim. App. 1994). Our supreme court upheld this court's conclusion in State v. Mann, 959 S.W.2d 503, 521 (Tenn. 1997) (appendix). Therefore, we conclude that the trial court did not err in giving the sequential jury instructions.

## III. Conclusion

Finding no reversible error, we affirm the judgment of the trial court.

_____
NORMA McGEE OGLE, JUDGE